**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Alan J. VALENZENO, Defendant–Appellant.**

No. 95–4203.

United States Court of Appeals, Sixth Circuit.

Argued May 1, 1997.

Decided Aug. 13, 1997.

Robert E. Bulford (argued and briefed), Office of U.S. Attorney, Akron, OH, for Appellee.

Timothy A. Smith (argued and briefed), Cincinnati, OH, for Appellant.

Before: WELLFORD, MOORE and COLE, Circuit Judges.

WELLFORD, J., delivered the opinion of the court, in which COLE, J., joined. MOORE, J. (pp. 371–374), delivered a separate opinion concurring in part and dissenting in part.

## OPINION

WELLFORD, Circuit Judge.

Defendant, Alan J. Valenzeno, acting as a tax preparer,[1] and his co-defendant, Donald Bilbrey, acting as an unlicensed private investigator, were engaged in an illegal scheme to defraud Valenzeno's "clients" by requesting large sums of money in exchange for their promise to resolve the clients' problems with the Internal Revenue Service ("IRS"). Valenzeno and Bilbrey were charged in a thirteen-count indictment with extortion under the Hobbs Act (18 U.S.C. § 1681), conspiracy to commit that crime, obtaining consumer credit information under false pretenses under the Federal Credit Reporting Act (15 U.S.C. § 1681), and with filing false tax returns for 1991 (26 U.S.C. § 7206(1)). Valenzeno, whose appeal is the only one before us, was convicted on five counts in the indictment, was acquitted as to one count, and a mistrial was declared as to the other counts. On this appeal, he challenges his convictions under the Hobbs Act and under the Federal Credit Reporting Act; he does not challenge his conviction for the income tax violation.

---

**1.** The indictment elaborated that Valenzeno was "engaged in business activities as a tax preparer and insurance salesman" using two business names in Strongville, Ohio.

## A. Background

Connie Sickle learned that she and her husband were being audited by the IRS for failing to report about $10,000 in income. Upon her attorney's recommendation, Sickle contacted Valenzeno for his assistance with the audit. Valenzeno requested that she supply him with her social security number and other identifying information. Co-defendant Bilbrey, acting in concert with Valenzeno and using an alias, "Frank," informed the Sickles that they needed $3,500 in order to help the Sickles out of their tax troubles. Valenzeno and Bilbrey told the Sickles that the money would be used for so-called "public relation" purposes, which was apparently a euphemism for payments (probably illegal) to certain IRS representatives to avoid or prevent asserted criminal prosecutions against these clients for tax evasion. After being pressed for the money, Sickle professed an inability to pay that amount. Valenzeno had checked Sickles' credit information and advised Sickle that she could obtain the $3,500 through a cash advance on her MasterCard account. Valenzeno and Bilbrey told the Sickles that Mr. Sickle would likely go to jail if the problem was not cleared up. The Sickles promptly obtained the money through MasterCard and paid it over to Valenzeno. Within a month, defendant demanded another $3,000 to deal with the same tax problem, and the Sickles became suspicious.

The Sickles later contacted their attorney and related what had transpired. The attorney turned the information over to the proper authorities, and an investigation of Valenzeno and Bilbrey ensued. It was discovered that no IRS criminal investigation of the Sickles was then taking place, and that Valenzeno and Bilbrey had been engaged in "persuading" a number of Valenzeno's clients to make substantial payments to them for the so-called "public relation" purposes. As was admitted in Valenzeno's brief, he and Bilbrey split the proceeds bilked from his unfortunate clients instead of using the money to bribe some unknown representative of the IRS.

## B. Hobbs Act Violations (18 U.S.C. § 1951)

█ Valenzeno claims that the Hobbs Act is unconstitutional. The Act proscribes the following:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section....

18 U.S.C. § 1951(a). The defendant, having been charged with extortion, maintains that the conduct described in the indictment is "non-commercial activity" with no effect on interstate commerce, and is thus beyond the authority of Congress to regulate, citing *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). We review this constitutional issue *de novo*.

█ We agree with the position of the government and the district court that the legislation at issue is clearly "directed at protection of interstate commerce against injury from extortion." *United States v. Green*, 350 U.S. 415, 420, 76 S.Ct. 522, 526, 100 L.Ed. 494 (1956). The Supreme Court has held:

> [T]he statutory language [of the Hobbs Act] *sweeps within it all persons who have 'in any way or degree ... affect[ed] commerce ... by robbery or extortion.'* 18 U.S.C. § 1951(a) (1976 ed.). These words do not lend themselves to restrictive interpretation; as we have recognized, they "manifest ... a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence," *Stirone v. United States*, 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960).[2]

---

2. "Extortion" is "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2).

*United States v. Culbert,* 435 U.S. 371, 373, 98 S.Ct. 1112, 1113, 55 L.Ed.2d 349 (1978) (emphasis added).

In *Lopez,* the Court struck down the recently enacted Gun Free Zones Act of 1990 as beyond Congress's commerce clause power because the Act had "nothing to with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." *Lopez,* 514 U.S. at 561, 115 S.Ct. at 1630–31. Congress, furthermore, made no reference to interstate commerce in the statute stricken; it contained "no express jurisdictional element [that would] limit its reach to a discrete set of firearm possessions [having] an explicit connection with or effect on interstate commerce." *Id.* at 561, 115 S.Ct. at 1631.

The Hobbs Act, unlike the Gun Free Zones Act, has been repeatedly upheld in its constitutionality. *See, e.g., United States v. Peete,* 919 F.2d 1168 (6th Cir.1990); *see also United States v. Jarrett,* 705 F.2d 198 (7th Cir.1983); *Carbo v. United States,* 314 F.2d 718 (9th Cir.1963); *Nick v. United States,* 122 F.2d 660 (8th Cir.1941). We stated in *Peete:*

> While regulating attempts to affect interstate commerce may occasionally result in the Hobbs Act being employed to combat bribery and extortion in what are purely intrastate contexts, the reach of Congress's authority to enact such a statute has been upheld by the Supreme Court. *"Extortionate credit transactions, though purely intrastate, may in the judgment of Congress affect interstate commerce...."*

*Peete,* 919 F.2d at 1174 (quoting *Perez v. United States,* 402 U.S. 146, 154, 91 S.Ct. 1357, 1361, 28 L.Ed.2d 686 (1971)).

■ Congress intended that the Hobbs Act's protection of interstate commerce extend as far as the Constitution permits and no farther. *Stirone v. United States,* 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960). If *Lopez* indicates that the Commerce Clause gives Congress less power than was previously thought to be the case, the proper remedy would be to give the statute a narrower interpretation, or to require a more substantial jurisdictional nexus, not to hold facially invalid an Act of Congress. *See Bass,* 404 U.S. at 350, 92 S.Ct. at 523–24 (avoid federalism question by holding that ambiguous statute contained jurisdictional element and reversing conviction where government failed to prove nexus with interstate commerce). *Compare United States v. Harrington,* 108 F.3d 1460, 1470 (D.C.Cir.1997) (holding that robbery's effect of removing $1,000 from interstate bank transfer satisfied Hobbs Act jurisdictional element), *with id.* at 1473 (Sentelle, J., dissenting) (arguing that robbery had too small an effect on interstate commerce to satisfy constitution after *Lopez*); *United States v. Woodruff,* 941 F.Supp. 910, 928 (N.D.Cal.1996) (granting judgment of acquittal of Hobbs Act charge because robbery had insufficient effect on commerce to withstand *Lopez* attack).[3] The Hobbs Act, which was enacted in order to protect interstate commerce, is a valid exercise of Congress' power to regulate and protect such commerce. *Accord United States v. Bolton,* 68 F.3d 396, 399 (10th Cir.1995); *United States v. Stillo,* 57 F.3d 553, 558 n. 2 (7th Cir.1995). Accordingly, we reject Valenzeno's attack on the constitutionality of the Hobbs Act.

■ Valenzeno also contends that there was insufficient proof of his acts of extortion as defined in the statute, 18 U.S.C. §§ 1951(a) and (b)(2). We review a sufficiency of the evidence claim by determining whether, "after viewing the evidence in a light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Collins,* 78 F.3d 1021, 1030 (6th Cir.) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)), *cert. denied,* —— U.S. ——, 117 S.Ct. 189, 136 L.Ed.2d 127 (1996).

Valenzeno argues that what was involved with the Sickles and with other victims was more akin to bribery, a crime with which he was not charged, than to extortion. There is

---

**3.** Valenzeno does not argue that his misconduct, which caused his victims to draw money on an out-of-state line of credit, had insufficient effect on interstate commerce to sustain his conviction; · he attacks only the facial validity of the Hobbs Act.

no dispute that Valenzeno misrepresented to the Sickles and to the other victims that he was going to use the money he extracted from them to bribe unidentified IRS representatives to eliminate their real or feared tax problems. Valenzeno, did not, in fact, bribe anyone; instead he extorted[4] money from those who relied upon his supposed tax service and expertise through fraud and misrepresentation.[5]

Defendant's argument that his actions were more akin to bribery than extortion is based on a distinction between the two crimes as described in *United States v. Capo*, 817 F.2d 947 (2d Cir.1987) (quoted in *United States v. Collins*, 78 F.3d 1021 (6th Cir. 1996)). The court in *Capo* held that bribery is not within the reach of the Hobbs Act, a holding with which we agree. *Capo* states that classic bribery occurs when the victims face "no increased risk if they did not pay, but, rather, stood only to improve their lots by paying defendants." *Id.* at 954. Extortion occurs, however, when "the defendant purports to have the power to hurt the victim in economic terms and fear is induced." *Id.* at 954.

■ The *Capo* case involved a job-selling scheme, a very different activity from the scam admittedly practiced by Valenzeno and Bilbrey. Nevertheless, we agree generally with the discussion of the extortion element of the Hobbs Act violation as described in that case. It teaches, for example, that "the element of 'fear' required by the Act can be satisfied by putting the victim in fear of economic loss." *Id.* at 951 (quoting from *United States v. Brecht*, 540 F.2d 45, 52 (2d Cir.1976)). Further, *Capo* teaches that "fear of economic loss" is viewed from the perspective of the victim. The facts of *Capo*, however, made it a classic case of bribery by the hiring supervisor defendant who was, in ef-

fect, selling Kodak jobs. In the instant case, Valenzeno fraudulently created a fear in his victims that they would suffer economic or personal harm if they did not pay for his help. In that situation, we find *Capo* to be of no help to Valenzeno's position.

Nor is our recent case of *Collins* any assistance to defendant. *Collins* involved the husband of the Kentucky governor abusing his authority by extorting money from potential state contractors by threatening to contract elsewhere if certain political contributions were not made. The defendant, Collins, contended that he was guilty of bribery, if anything, not Hobbs Act extortion, because none of the payors gave their money out of fear; rather, they sought some form of economic gain. This court disagreed. The court began with the premise that "extortion by wrongful use of fear encompasses threats of economic loss." *Collins*, 78 F.3d at 1030. Furthermore, "[t]he fear need not be the product of the defendant's actions. 'It is enough if the fear exists and the *defendant intentionally exploits it.*'" *Id.* (quoting *United States v. Williams*, 952 F.2d 1504, 1513–14 (6th Cir. 1991) (emphasis added)). The court rejected the defendant's argument and found that the Hobbs Act conviction should be upheld because the contractors feared that they would forfeit any potential business opportunity with Kentucky. In the instant case, the victims' fears were not merely based on lost business opportunity, but they were real fears of economic loss or potential imprisonment. There was ample evidence at trial that Valenzeno played upon those fears in the Sickles and many other victims in order to extract their money for his alleged aid.

We find no merit, therefore, in defendant's contentions as to 18 U.S.C. § 1951. Valenzeno's actions affected commerce, and the Hobbs Act is not unconstitutional. In addi-

---

4. We use the word "extort" in the dictionary sense:

> *Extort:* to compel or coerce ... by any means serving to overcome one's power of resistance; to gain by wrongful methods; to obtain in an unlawful manner; to exact something wrongfully by threats or putting in fear.
> *Extortion:* the obtaining of property from another induced by wrongful use of ... force ... or fear, or under color of official right.

BLACK'S LAW DICTIONARY (6th Ed.). WEBSTER'S THIRD INTERNATIONAL DICTIONARY includes in its definitions *"extort,"* "to obtain from an unwilling or reluctant person by importunity, argument or ingenuity" or "to deceive."

5. We cannot discern why the government did not charge wire fraud in this case.

tion, the proof supports the charges that Valenzeno obtained money from his victims, with their consent, by wrongfully exploiting their fears of economic and personal harm in connection with IRS investigations.

## C. Federal Credit Reporting Act Violations (15 U.S.C. § 1681)

As previously indicated, the defendant discovered that the Sickles had a MasterCard credit account and urged them to utilize the account to obtain the $3,500 that Valenzeno requested for his assistance. To obtain that credit card information on the Sickles and other clients, Valenzeno used his access to Trans Union, a consumer reporting agency. As a member of Trans Union, Valenzeno could obtain consumer history and other information on his clients or his extortion "victims," as the case may be. When Valenzeno applied for membership to Trans Union, he claimed to have a need to make such credit checks by obtaining consumer information "to screen potential clients before extending credit."

At trial, Valenzeno was convicted on two counts of obtaining credit card information under false pretenses with respect to alleged victims Ed W. Taylor (Count 3)[6] and A.J. Rose (Count 6).[7] Title 15 U.S.C. § 1681(q) specifies:

> Any person who knowingly and willfully obtains information on a consumer from a consumer reporting agency under false pretenses shall be fined not more than $5,000 or imprisoned not more than one year, or both.

The government claimed that the consumer reports were obtained willfully and for improper purposes by defendant "to target those individuals as victims of the extortion scheme."

### 1. Ed Taylor

■ The government's contention as to Taylor was that he contacted Valenzeno by phone to seek advice about a domestic relations tax problem. Taylor, however, never kept his appointment. Nevertheless, Valenzeno obtained a consumer report from Trans Union on Taylor, and there was discovered in Taylor's file a notation that Taylor was on the "Bad Boy" list. There was no actual contact between Valenzeno and Taylor. Valenzeno never attempted to obtain money from him; there was no actual misuse of the information for fraudulent purposes.

The government cites not a single criminal case interpreting this criminal section in a complex civil statute (15 U.S.C. § 1681). At the time Valenzeno obtained the report, there is no evidence that he made any particular assertion regarding his intended purpose. He apparently never asked Taylor about authority to run a credit check on him.

The issue is a close one, but in a situation where no actual economic harm resulted and no effort was made to defraud Taylor, we are reluctant to conclude that a sufficient showing has been made for a criminal conviction in the application of a little-used statutory provision with no clear legislative history. See Kennedy v. Border City Savings, 747 F.2d 367 (6th Cir.1984). A reasonable jury could not determine from the sparse evidence whether Valenzeno had picked Taylor as a potential target for his extortion scheme or whether Valenzeno expected to render legitimate services to Taylor on a deferred payment basis. In sum, what was demonstrated as to Taylor may have served as the basis for a civil suit against Valenzeno, but we conclude there was insufficient proof to convict Valenzeno of a crime in that regard pursuant to 15 U.S.C. § 1681.

### 2. A.J. Rose

■ Count 6 charged that Valenzeno "obtained consumer information ... under false pretenses" on A.J. Rose, a consumer. The record, however, does not show that Valenzeno actually received any such information on that person. The most claimed in the

---

6. Count 3 charged that "defendant knowingly and willfully obtained information on a consumer, Edward W. Taylor, from a consumer reporting agency under false pretenses...." (Emphasis added.)

7. Count 6 charged that "defendant knowingly and willfully obtained information on a consumer, A.J. Rose, from a consumer reporting agency under false pretenses...." (Emphasis added.)

government's brief on this issue is that defendant generated a credit report search for A.J. Rose, who was the landlord of the Sickles. The government conceded that *neither* Rose nor Valenzeno made any attempt at a contact.

Simply initiating a consumer information search on Rose and *not* receiving consumer information on that subject consumer is not enough under this charge. Even if Valenzeno had false pretenses as his motivation, the proof is insufficient to convict on count 6.

In summary, then, we **AFFIRM** the Hobbs Act and the conspiracy convictions for the reasons stated. We **REVERSE**, however, the Consumer Credit Act convictions.

MOORE, Circuit Judge, concurring in part and dissenting in part. I write separately because I view several aspects of this case differently than do my colleagues and because I dissent in part from the majority's conclusion.

## I. HOBBS ACT

I am troubled by Valenzeno's Hobbs Act conviction. The evidence in this case indicates that Valenzeno engaged in a scheme to defraud his victims by convincing them that the IRS would put them in prison for tax evasion unless they paid a bribe. The government, however, chose to prosecute him for extortion, not fraud. In the end, I agree that Valenzeno "obtain[ed] ... property from another ... by wrongful use of actual ... fear," as this court has construed this provision: the Sickles were clearly in fear of the

claimed prosecution, and Valenzeno used this fear to extract money from them—and that the conviction must therefore stand. *See* 18 U.S.C. § 1951(b)(2) (defining extortion); *United States v. Collins,* 78 F.3d 1021, 1030 (6th Cir.1996); *United States v. Williams,* 952 F.2d 1504, 1513–14 (6th Cir.1991) ("It is enough [to sustain a conviction] if ... fear exists and the defendant intentionally exploits it."). *Cf. United States v. Culbert,* 435 U.S. 371, 380, 98 S.Ct. 1112, 1117, 55 L.Ed.2d 349 (1978) ("Our examination of the statutory language and the legislative history of the Hobbs Act impels us to the conclusion that Congress intended to make criminal all conduct within the reach of the statutory language.").

I am concerned, however, that this construction of the Act gives it a far broader scope than the enacting Congress intended. I see little to distinguish Valenzeno's scheme from one in which a dishonest auto mechanic extracts money from a customer by fraudulently telling him that without expensive repairs his car will likely fall apart on the highway.[1] Both cases are clearly fraudulent, but are they extortionate? *Cf. Culbert,* 435 U.S. at 378, 98 S.Ct. at 1116 ("As Representative Hobbs noted, the words robbery and extortion 'have been construed a thousand times by the courts. Everybody knows what they mean.'") (quoting 91 CONG.REC. 11912 (1945)). It seems unlikely that "everybody" would agree that the crooked mechanic's behavior constitutes extortion, and Justice Traynor implied in a case similar to the one at bar that even Valenzeno's scheme would

---

1. The government did not indict Valenzeno under the "color of official right" prong of the Hobbs Act, which would also not apply to this hypothetical mechanic. *See* Joint Appendix (J.A.) at 14 (Indictment). Under that prong, which essentially codifies common-law extortion, the public official's position of power provides the necessary coercive element and no showing of fear is necessary. *See Evans v. United States,* 504 U.S. 255, 265–66, 112 S.Ct. 1881, 1887–88, 119 L.Ed.2d 57 (1992). The "force or fear" prong, on the other hand, is more akin to blackmail than to common-law extortion. *See* WAYNE R. LAFAVE & AUSTIN W. SCOTT, JR., SUBSTANTIVE CRIMINAL LAW § 8.12 (1986). *Cf. Evans,* 504 U.S. at 267 n. 18, 112 S.Ct. at 1889 n. 18 (discussing distinction between two prongs of Hobbs Act); James Lindgren, *The Elusive Distinction Between Bribery and Extortion: From the Common Law to the*

Hobbs Act, 35 UCLA L. REV. 815 (1988) (cited *passim* in *Evans* ). At least one court has ignored the distinction between the two prongs and held that bribery and extortion are not mutually exclusive under either prong. *See United States v. Lisinski,* 728 F.2d 887, 891–92 (7th Cir.) (relying on "color of official right" cases to support conviction under fear prong), *cert. denied,* 469 U.S. 832, 105 S.Ct. 122, 83 L.Ed.2d 64 (1984). Our circuit, however, has long recognized that bribery and extortion merge only where the extortion is by color of official right, and that solicitation of a bribe will often not constitute extortion by the wrongful use of fear. *See Collins,* 78 F.3d at 1030; *United States v. Harding,* 563 F.2d 299, 305 (6th Cir.1977). *See generally* Lindgren, *supra,* at 875–82 (discussing application of extortion to private persons at common law).

not be extortion unless he had at least implicitly threatened his targets. *See People v. Camodeca*, 52 Cal.2d 142, 338 P.2d 903, 906–07 (1959). *Contra Williams*, 952 F.2d at 1513. And, if Valenzeno really had been "helping" the Sickles by bribing an IRS official to halt a prosecution, or if the car really were dangerous and needed repairs (but cheaper ones than the mechanic proposed), would their misconduct be extortion? Again, both situations involve the wrongful[2] use of fear to obtain money,[3] and would therefore fall within the statutory definition. *Cf.* James Lindgren, *The Elusive Distinction Between Bribery and Extortion: From the Common Law to the Hobbs Act*, 35 UCLA L. REV. 815, 876 (1988) (noting seventeenth-century cases in which private persons were prosecuted for extortion for charging excessive fees). Were I writing on a blank slate I would explore the implications of holding that extortion by "use of fear" requires that the victim fear that the extortionist will take some action if payment is not forthcoming, and that it is not extortion if the victim merely believes that the person requesting payment will refrain from acting if no payment is made. *Cf. United States v. Capo*, 817 F.2d 947, 954 (2d Cir.1987) (en banc) (holding that "[w]ithout evidence that the payor feared some negative intervention for non-payment, the payment is solely intended to secure an otherwise unsecured result," and the crime is bribery rather than extortion); George P. Fletcher, *Blackmail: The Paradigmatic Crime*, 141 U.PA.L.REV. 1617, 1621–23 (1993) (discussing possibility of distinguishing between legal offers and illegal threats on basis of relation to "baseline of normalcy," departures from which could constitute blackmail). Not every snake-oil salesman who preys on our fears of sickness and death is an extortionist. Under this court's binding precedent in *Collins* and *Williams*, however, I agree that the conviction must stand.

## II. FAIR CREDIT REPORTING ACT

Valenzeno was also convicted of two counts of violating 15 U.S.C. § 1681q, which provides that "[a]ny person who knowingly and willfully obtains information on a consumer from a consumer reporting agency under false pretenses shall be fined ... or imprisoned." 15 U.S.C. § 1681q. I agree with the majority that there was no evidence that Valenzeno actually managed to obtain any information about A.J. Rose and that his conviction on Count Six must be vacated. I cannot, however, agree that the government failed to present sufficient proof that Valenzeno's obtaining a credit report on Ed Taylor violated § 1681q. The majority seems to base its holding on determinations that (1) there is insufficient evidence that Valenzeno wanted the reports for other than legitimate purposes, (2) Valenzeno never told the credit agency why he wanted Taylor's report, and (3) Taylor suffered no harm from having his credit report revealed. Under the facts of this case, the first of these determinations is wrong and the other two are irrelevant.

As the majority notes, the evidence shows, and the jury apparently found, Valenzeno obtained a credit report on Connie and Bernie Sickle in order to determine whether they had access to a line of credit that they could use to obtain money to pay Valenzeno. *See* J.A. at 232 (Connie Sickle Testimony) (Valenzeno told her to use their credit card to get $3,500.); J.A. at 335–48 (Sickle Credit Reports seized from Valenzeno residence).[4]

---

**2.** The Hobbs Act's use of "wrongful" "limits the statute's coverage to those instances where the obtaining of the property would itself be 'wrongful' because the alleged extortionist has no lawful claim to that property." *United States v. Enmons*, 410 U.S. 396, 400, 93 S.Ct. 1007, 1010, 35 L.Ed.2d 379 (1973). Thus, where one uses fear to obtain money to which one has no lawful claim, the use of fear is wrongful.

**3.** Even farther afield, what of a situation in which a person refuses to help another out of a bad situation without a large payment? Does a good Samaritan become an extortionist by de-

manding payment as a prerequisite to acting, even where there is no duty to act? A similar paradox in the law of blackmail—that it is legal to reveal embarrassing secrets about people and to ask them for money, but not to threaten reveal the secrets unless money is paid—has generated an extensive literature. *See generally* Symposium, *Blackmail*, 141 U.PA.L.REV. 1565 (1993).

**4.** The prosecution also presented extensive evidence suggesting that Valenzeno had committed similar frauds against Fred Ghadimi, J.A. at 115 (Valenzeno requested $4,000 to bribe IRS officials); Kimberly Meyer, J.A. at 157–59 (Valen-

The government's theory as to Count Three was that Valenzeno obtained Taylor's credit report for exactly the same reason: to determine whether Taylor had access to sufficient funds to make substantial payments in a similar scheme. The evidence of this included a copy of a credit report on Taylor that was found in a file—labeled "Ed Taylor"—in Valenzeno's home, and testimony as to the details of that seizure. *See* J.A. at 65–70; J.A. at 298–300 (Credit Report). Several items on the credit report were circled, including Taylor's credit limit on a credit card. *See* J.A. at 298. The file also contained what the government fairly characterizes as a script to be used while talking with Taylor, which lists Taylor's phone number and states, inter alia, "[i]t *looks good and I can keep you a free man. All I need is the $2,500 fee and I'll get started. Since we've opened [P]andora's box we need to get started in a hurry. Get the money to me in 48 hrs.*" *See* J.A. at 297. *Accord* J.A. at 298 (regarding Taylor's phone number). A government witness testified that another document read, "[h]i, this is Al, I've told the folks that they would be there with your POA in 48 hours. I don't want these people madder than they are already. So I've got to ... have the fee immediately." J.A. at 66. Because Taylor failed to keep an appointment with Valenzeno, he had no contact with him other than a single phone call from Valenzeno. *See* J.A. at 280, 277.

Although the evidence as to why Valenzeno obtained the credit information on Taylor was not as direct as the evidence relating to the Sickles' credit report, it was nonetheless sufficient to support the inference that Valenzeno's purposes in obtaining credit reports were the same in both cases.[5] Both Taylor's and the Sickles' credit reports had the credit limit balances highlighted. *See* J.A. at 146–47, 298. The reference to "open[ing] Pandora's box" and needing to "get started in a hurry" suggest that Valenzeno intended to perpetrate the same fraud on Taylor as on the Sickles and the others: legitimate tax preparation services do not usually involve a 48–hour window of opportunity and thousands of dollars in cash prepayment, but Valenzeno's other frauds did. Finally, if Valenzeno had obtained the credit report in order to determine whether to offer credit to Taylor, it is hard to see why after seeing the completely normal report he would then have demanded $2,500 before beginning tax preparation work. *See* J.A. at 276. That the evidence was circumstantial does not mean that it was insufficient to support the jury's inference that Valenzeno obtained Taylor's credit report for improper purposes.

The statute, of course, prohibits obtaining consumer information under false pretenses, not obtaining it for an improper purpose.[6] And, the evidence is undisputed that Valenzeno did not give any reasons for his request at the time he obtained Taylor's credit report. Under the facts of this case, however, I am nonetheless persuaded that Valenzeno violated the statute.

When Valenzeno opened his account with the credit reporting agency he stated in his application that he needed the reports because he had lost money on account of uncre-

---

zeno requested $2,000 payment within 48 hours); David Nusbaum, J.A. at 171, 173–74 (Valenzeno requested total of $1,400 to go "speak to the people involved to get [Nusbaum] off [an IRS] audit," but tax problem was never resolved); Richard Reyes, J.A. at 181–82, 184 (Valenzeno told him he needed $6,000 to pay IRS officials to stop investigation); and Raymond Wells, J.A. at 293 (Valenzeno requested $1,800 to pay friend at IRS). The search of Valenzeno's house uncovered folders on these people, several of which contained "scripts," and credit reports on Reyes and his wife. *See* J.A. at 59–60, 64, 80, 82, 87. There is no indication that Valenzeno ever actually paid any bribes.

5. Because Valenzeno challenges the sufficiency of the evidence, we can overturn his conviction only if no rational juror could have returned a guilty verdict based on this evidence. *United States v. Collins*, 78 F.3d 1021, 1030 (6th Cir. 1996).

6. A recent amendment to the Act which is to take effect on September 30, 1997, will impose civil, but not criminal, liability on persons who knowingly obtain information for an improper purpose. *See* Omnibus Consolidated Appropriations Act [of] 1997, Pub.L. 104–208 § 2412(c), 110 Stat. 3009–446, 454 (1996) (amending 15 U.S.C. § 1681n(b) to provide that "[a]ny person who obtains a consumer report from a consumer reporting agency under false pretenses or knowingly without a permissible purpose shall be liable to the consumer reporting agency.").

ditworthy clients in the past and wanted to avoid such losses in the future.[7] *See* J.A. at 151. By telling the credit agency that he would be making future requests for a certain purpose, Valenzeno clearly implied that any future request would be for the specified purpose; in this regard, Professors LaFave and Scott's discussion of the statutory crime of false pretenses is relevant and persuasive:

A misrepresentation for false pretenses generally requires some affirmative conduct.... No doubt affirmative statements which reinforce false impressions which the defendant did not create, or affirmative conduct in suppressing the truth—e.g., the defendant actually hides information and so prevents the victim from learning the truth—will do as well. Mere silence, however, will generally not suffice, even though the silent one realizes that the other is acting under a mistaken impression. *Under special circumstances there may, nevertheless, be a duty to speak to correct a misapprehension (thus making silence the basis of liability)—as where the defendant has, even though innocently, previously created the misapprehension by something he said or did....*

WAYNE R. LaFAVE & AUSTIN W. SCOTT, JR., SUBSTANTIVE CRIMINAL LAW § 8.7(b)(3) (1986) (emphasis added) (citations omitted). Valenzeno's prior dealings with the credit agency created the impression that he would request reports only for certain purposes; his obtaining Taylor's credit report for other, illicit reasons without disclosing them constituted obtaining the report under false pretenses. This is precisely what the statute prohibits: because part of the Act's purpose is to protect consumer privacy, § 1681q does not require that the victim suffer economic harm or be the victim of fraud. *Cf.* 15 U.S.C. § 1681(a)(4) (congressional finding that

"[t]here is a need to insure that consumer reporting agencies exercise their grave responsibilities with ... a respect for the consumer's right to privacy."); *Trans Union Corp. v. Federal Trade Comm'n*, 81 F.3d 228, 234 (D.C.Cir.1996) ("[A] major purpose of the Act is the privacy of a consumer's credit-related data."). I would uphold the conviction under Count Three, and I respectfully dissent from the majority's contrary conclusion.

---

7. The Fair Credit Reporting Act requires that credit reporting agencies obtain such information from prospective customers. *See* 15 U.S.C. § 1681e ("Every consumer reporting agency shall maintain reasonable procedures designed to avoid violations of section 1681c of this title and to limit the furnishing of consumer reports to the purposes listed under section 1681b of this title. These procedures shall require that prospective users of the information identify themselves, certify the purposes for which the infor-

mation is sought, and certify that the information will be used for no other purpose. Every consumer reporting agency shall make a reasonable effort to verify the identity of a new prospective user and the uses certified by such prospective user prior to furnishing such user a consumer report. No consumer reporting agency may furnish a consumer report to any person if it has reasonable grounds for believing that the consumer report will not be used for a purpose listed in section 1681b of this title.").