**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Ray Allen TAYLOR, Defendant–Appellant.**

**No. 96–6341.**

United States Court of Appeals, Sixth Circuit.

Argued Dec. 16, 1998.

Decided May 10, 1999.

Rehearing Denied July 6, 1999.*

---

* Judge Nelson adheres to the views expressed in his dissenting opinion.

John W. Tullis (argued and briefed), Bennett, Bowman, Triplett & Vittitow, Owensboro, Kentucky, for Defendant–Appellant.

Kent Wicker (argued and briefed), Terry M. Cushing (briefed), Assistant U.S. Attorneys, Louisville, Kentucky, for Plaintiff–Appellee.

Before: NELSON, RYAN, and COLE, Circuit Judges.

RYAN, J., delivered the opinion of the court, in which COLE, J., joined. DAVID A. NELSON, J. (pp. 339–41), delivered a separate opinion concurring in part and dissenting in part.

RYAN, Circuit Judge.

The defendant, Ray Allen Taylor, appeals following a jury conviction on one count of conspiracy to interfere with interstate commerce by robbery, in violation of 18 U.S.C. § 371, and one count of using a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c). Taylor argues, *inter alia*, that the evidence was insufficient to prove that he "used" a firearm, within the meaning of section 924(c), during and in relation to the crime of violence, namely, the conspiracy. We agree with Taylor on this point, although we reject his other arguments, and we will reverse his conviction and remand for further proceedings.

## I.

Taylor came to an agreement with Bruce Thomas Mominee, a dealer in American Indian artifacts, to rob Mrs. Louie Mattox, a Kentucky resident, of her valuable collection of American Indian artifacts. Taylor agreed to find an accomplice to perform the robbery, while Mominee agreed to market and sell the collection after it was stolen.

Mominee took pictures of Mattox's house and her collection of artifacts for Taylor's use in carrying out the burglary. A few days later, Taylor asked Frankie Piper to commit the burglary, showed him the pictures that were taken by Mominee, and further discussed their plan to steal the artifacts. Unbeknownst to Taylor or Mominee, Piper informed the Kentucky State Police of the plan and agreed to cooperate with them in their effort to ap-

prehend Taylor and Mominee and recover any stolen property.

Two days after Taylor's initial contact of Piper, and after Piper had begun cooperating with the police, Taylor gave Piper a number of items: (1) a High Standard, Sport King Model .22 caliber pistol, with the serial number removed; (2) a firearm silencer, with no serial number; (3) approximately 70 rounds of Federal brand .22 caliber ammunition; (4) a 12,000–volt electronic stun gun; (5) a canister containing a chemical substance capable of incapacitating a person temporarily; (6) a roll of duct tape; (7) two face masks; (8) two pairs of gloves; (9) a Kentucky automobile registration plate; and (10) cutting pliers. Piper immediately turned all the items over to the police. Further, a surveillance videotape of this encounter contains many incriminating statements made by Taylor, showing that he knowingly presented Piper with the gun and the silencer. For example, Taylor advised Piper to use the gun and silencer to shoot a large dog near Mattox's home if it started barking.

Two days later, at the request of the Kentucky State Police, Piper falsely advised Taylor that he had completed the burglary. That same day Mominee traveled to Taylor's house to receive the stolen goods. The next day, the Kentucky State Police and Bureau of Alcohol, Tobacco and Firearms Special Agent Dennis Price executed search and arrest warrants at Taylor's home. Taylor gave a confession to the arresting officers in which he implicated Mominee and explained in great detail the planning of the burglary. Specifically, Taylor explained the manner in which he stored the gun prior to delivering it to Piper, and his knowledge that a silencer was attached to the gun. Taylor denied knowing who removed the serial number from the gun.

In due course, both Taylor and Mominee were indicted. A superseding indictment charged Taylor with one count of conspiracy to violate the Hobbs Act by interfering with interstate commerce by robbery, in violation of 18 U.S.C. § 371 (Count 1); one count of using a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c) (Count 2); one count of possessing a firearm with an obliterated serial number, in violation of 18 U.S.C. §§ 922(k), 924(a)(1)(B) (Count 3); and one count of possessing an unregistered firearm, in violation of 26 U.S.C. §§ 5861(d), 5871 (Count 4).

A jury returned a guilty verdict against Taylor with respect to all counts. The district court, however, granted a new trial with respect to counts 1 and 2—the Hobbs Act and 924(c) counts—based on flawed jury instructions, and imposed a 70–month sentence on the remaining two firearm counts.

Taylor appealed both from his judgment of conviction and from the order granting him a new trial. The latter appeal was dismissed by this court for lack of appellate jurisdiction. With respect to the former appeal, a panel of this court affirmed in part, but vacated the conviction on Count 3, possession of a firearm with an obliterated serial number, based again on flawed jury instructions, and remanded for further proceedings. *See United States v. Taylor,* No. 95–6531, 1997 WL 178877 (6th Cir. Apr.11, 1997).

Meanwhile, a second trial was held on counts 1 and 2 in June 1996. Taylor was again convicted. He was sentenced to 33 months' imprisonment on Count 1, to run concurrently with the 70–month sentence he was then appealing, and to 360 months' imprisonment on Count 2, to run consecutively. Taylor then filed this timely appeal.

## II.

### A.

■ Taylor first argues that the district court erred in granting him a new trial on counts 1 and 2 when he had moved for acquittal, not a new trial. The thrust of his argument is that the district court was

without jurisdiction to grant a new trial because too much time had elapsed since Taylor's conviction. *See* Fed.R.Crim.P. 33; *United States v. Koehler,* 24 F.3d 867, 869 (6th Cir.1994). The government responds that this court lacks appellate jurisdiction to review the district court's decision to grant a new trial rather than the requested acquittal, citing *Northern v. United States,* 300 F.2d 131 (6th Cir.1962).

Both parties miss the mark. *Northern* stands only for the proposition that an order granting a new trial is not itself an appealable order because it is not a "final decision" within the meaning of 28 U.S.C. § 1291. *See id.* at 132. It is elementary, however, that even though a party may not file an appeal from that order, that does not mean he may never obtain review of the decision, once a final order has been entered. *See id.* at 132–33. Instead, "[t]he order.. is 'reviewable by the Court of Appeals at the proper time, which is following the subsequent entry of the final judgment which disposes of the case, and from which an appeal may be taken.'" *Id.* at 133 (citation omitted).

■ On the other hand, Rule 33 does not govern the situation in which Taylor finds himself. The language of that rule precludes the *filing* of a *motion* for a new trial after seven days, but does not address the district court's authority to deny a timely motion for acquittal, while nonetheless concluding that the arguments underlying the motion justify a new trial. *See, e.g., United States v. Baker,* 432 F.2d 994, 995 (10th Cir.1970). Indeed, Taylor himself concedes that the Federal Rules of Criminal Procedure do not preclude the district court's approach. *See id.*

■ The district court's decision to grant a new trial is reviewed for an abuse of discretion. *See United States v. Rapanos,* 115 F.3d 367, 372 (6th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 304, 139 L.Ed.2d 234 (1997). Taylor does not contend that the district court abused its discretion in granting him a new trial, only

that the district court had no discretion to do so at all. Since this argument, as we have explained, has no merit, we will proceed to Taylor's second assignment of error.

### B.

During the first trial, the jury was presented with certain specific interrogatories with regard to Count 1, the conspiracy count, some of which the jury answered in the affirmative, and others of which it answered in the negative. Specifically, the jury was asked whether the following nine overt acts, all of which had been alleged in the superseding indictment, were "proven" or "not proven":

1. In or about July, 1992, the exact date being unknown to the Grand Jury, **BRUCE THOMAS MOMINEE**, defendant herein, travelled from Evansville, Indiana, to Waverly, Kentucky, for the purpose of appraising for purposes of sale the Indian artifact collection of Louie Mattox, and while doing so did photograph the said collection.

2. Between late September to early October, 1992, the exact date being unknown to the Grand Jury, **BRUCE THOMAS MOMINEE** travelled from Indiana to the Western District of Kentucky for the purpose of delivering to **RAY ALLEN TAYLOR**, defendant herein, photographs of the collection of American Indian artifacts stored at the residence of Mrs. Louie Mattox, in Waverly, Kentucky.

3. Between late September to early October, 1992, the exact date being unknown to the Grand Jury, **BRUCE THOMAS MOMINEE** delivered to **RAY ALLEN TAYLOR** the said photographs of the Mattox collection of American Indian artifacts.

4. On or about October 12, 1992, in Union County, Kentucky, **RAY ALLEN TAYLOR** solicited the theft, by robbery, of the Mattox collection of American Indian artifacts by a person whose identity is known to the Grand Jury.

5. On or about October 12, 1992, in Union County, Kentucky, **RAY ALLEN TAYLOR** displayed the photographs of the Mattox collection of American Indian artifacts described in paragraphs 1 and 2 of these Overt Acts to the unnamed person alleged in paragraph 4 of these Overt Acts, in order to facilitate the theft of said artifacts by that person.

6. On or about October 14, 1992, in Union County, Kentucky, **RAY ALLEN TAYLOR** delivered to the unnamed person alleged in paragraph 4 of these Overt Acts, among other things, a High Standard, Sport King Model, .22 caliber pistol, the serial number of which had been obliterated; a firearm silencer, approximately six inches (6") in length and one and one-quarter inches (1–1/4") in diameter, bearing no serial number; approximately seventy (70) rounds of Federal brand, .22 caliber ammunition; a 120,000 volt electronic stun gun; a canister containing a chemical substance capable of incapacitating a person temporarily; a roll of duct tape; two (2) facial masks; two (2) pairs of gloves; a Kentucky automobile registration plate; and cutting pliers, in order to facilitate the theft of the Mattox collection of American Indian artifacts.

7. On or about October 14, 1992, **RAY ALLEN TAYLOR** discussed the planned robbery of the Mattox residence with the unnamed person alleged in paragraph 4 of these Overt Acts.

8. On or about October 16, 1992, the unnamed person alleged in paragraph 4 of these Overt Acts represented to **RAY ALLEN TAYLOR** that he, the unnamed person, had stolen the collection of American Indian artifacts from the Mattox residence.

9. On or about October 16, 1992, **BRUCE THOMAS MOMINEE** travelled from Indiana to the residence of **RAY ALLEN TAYLOR** in Kentucky for the purpose of taking possession of the Mattox collection of Indian artifacts.

The jury responded that the overt acts alleged in paragraphs 4, 5, 6, 7, and 8 were "proven," but that the overt acts alleged in paragraphs 1, 2, 3, and 9 were "not proven."

Taylor argues that the jury's responses amount to a "constructive acquittal" on the conspiracy count, because the acts the jury found not proven were those involving the joint conduct of Mominee and Taylor; in other words, Taylor was shown only to have formed a "conspiracy" with Piper, who was a government agent, and thus not someone with whom Taylor can be convicted of having conspired. Therefore, Taylor reasons, either the doctrine of issue preclusion, sometimes called collateral estoppel, or that of double jeopardy should have barred the second trial on Count 1.

Neither doctrine, however, is of any aid to Taylor. The doctrine of issue preclusion forbids the government from relitigating an issue only where an issue of ultimate fact, necessary to the judgment, was determined in the defendant's favor by a valid final judgment. *See Ashe v. Swenson,* 397 U.S. 436, 443, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). There was, obviously, no ultimate fact determined in Taylor's favor during the first trial, since he was convicted, not acquitted, by the jury. And assuming *arguendo* that something less than a valid final judgment of acquittal can have any preclusive effect—a point which we need not decide, but about which we are dubious—Taylor nonetheless cannot be said to have been "constructively" acquitted. There was an abundance of evidence in this case that Taylor conspired with Mominee, and the fact that the overt acts described in the execution of the conspiracy did not involve a joint activity with Mominee is simply beside the point. The jury found that the defendant had agreed with another to do something the law forbids, and also found that one member of the conspiracy committed an overt act in furtherance of the conspiracy. The law of conspiracy does not require the government to prove anything more.

For the same reasons, Taylor's double-jeopardy argument fails as well. Retrial after the district court's grant of a new trial does not violate the prohibition against double jeopardy because jeopardy terminates only when the defendant is acquitted or when the guilty verdict has been unsuccessfully appealed. *See Richardson v. United States,* 468 U.S. 317, 325, 104 S.Ct. 3081, 82 L.Ed.2d 242 (1984). Again, neither situation adheres in Taylor's case.

### C.

Taylor next argues that his conviction for using a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c), must be reversed in light of *Bailey v. United States,* 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995). Specifically, he contends that because his only act in relation to the firearm was to transfer it to Piper, well in advance of the proposed robbery, the evidence was necessarily insufficient to show that he *used* the firearm during and in relation to the crime of violence in question. On appeal, we consider his contention by asking " 'whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. McRae,* 156 F.3d 708, 712 (6th Cir.1998) (emphasis and citation omitted).

The applicable version of section 924(c) of Title 18 reads in relevant part as follows:

(c)(1) Whoever, during and in relation to any crime of violence ... for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence ..., be sentenced to imprisonment for five years, ... and if the firearm ... is equipped with a firearm silencer ..., to imprisonment for thirty years.

. . . .

(3) For purposes of this subsection the term "crime of violence" means an offense that is a felony and—

(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924 (West Supp.1998).

As an initial matter, Taylor does not dispute that a conspiracy to violate the Hobbs Act is a "crime of violence" within the meaning of section 924(c). We note, however, that our independent review of the subject makes it plain to us that any such dispute would be unavailing. It is well-settled that whether a crime is one "of violence" is a determination we make by looking to the statutory definition of the crime, rather than to the evidence presented to prove it. *See Taylor v. United States,* 495 U.S. 575, 602, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990). The Hobbs Act makes it unlawful to "affect[ ] commerce or the movement of any article or commodity in commerce, by robbery or ... [to] conspire[ ] so to do." 18 U.S.C. § 1951(a). Taylor was actually charged with and convicted of not a violation of the Hobbs Act, however, but with a violation of 18 U.S.C. § 371, which makes it unlawful for "two or more persons [to] conspire ... to commit any [federal] offense." For purposes of the violent-crime analysis, however, this charging technicality makes no difference. In any event, the Hobbs Act defines "robbery" as the unlawful taking of property from a person "by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining." 18 U.S.C. § 1951(b)(1). We conclude that, given

these definitions, a conspiracy to commit a robbery that violates the Hobbs Act is necessarily a conspiracy that, by its nature, involves a substantial risk that physical force may be used against the person or property of another, and therefore is a crime of violence within the meaning of section 924(c). *See, e.g., United States v. Juvenile Male,* 118 F.3d 1344, 1350 (9th Cir.1997); *United States v. Elder,* 88 F.3d 127, 129 (2d Cir.1996).

 Taylor's argument is simply that he did not *use* a firearm in connection with the conspiracy offense. In considering his argument, we turn first to *Bailey,* 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472, in which the Supreme Court considered the meaning of the word "use" in the context of section 924(c)(1), and held that mere possession of a firearm does not suffice for conviction. The Court ruled that "[t]o sustain a conviction under the 'use' prong of § 924(c)(1), the Government must show that the defendant actively employed the firearm during and in relation to the predicate crime." *Id.* at 150. Section 924(c)(1) "requires evidence sufficient to show an active employment of the firearm by the defendant, a use that makes the firearm an operative factor in relation to the predicate offense." *Id.* at 143. "[A]ctive employment," the Court specified, "includes brandishing, displaying, bartering, striking with, and most obviously, firing or attempting to fire, a firearm." *Id.* at 148.

In so holding, "the Court rejected a more expansive interpretation of use under which a defendant 'uses' a gun when he 'conceals a gun nearby to be at the ready for an imminent confrontation.'" *United States v. Anderson,* 89 F.3d 1306, 1313 (6th Cir.1996) (quoting *Bailey,* 516 U.S. at 149). In considering *Bailey*'s scope and effect, this court has rejected an argument by the government that a defendant "can be found guilty under § 924(c) for attempting to use a gun, without more.... Here, § 924(c), among other things, makes it a crime to use or carry a firearm during a drug trafficking offense; it does not specif-

ically criminalize an attempt to use or carry a firearm during such an offense." *Id.* at 1314 (emphasis omitted). In *Anderson,* we interpreted *Bailey* as follows:

> *Bailey* represents the Supreme Court's concern that factors such as proximity and accessibility are insufficiently reliable indicators of intent to use a gun during a drug offense or crime of violence. By limiting use to situations in which the gun is in defendant's hand or where the defendant manifests his intent to use the gun by referring to it in such a way as to influence others, the Court sought to reduce the potential for erroneous determinations regarding defendant's intent.

*Id.* at 1314–15.

Only one other court has considered the precise question facing us today. In *United States v. Phan,* 121 F.3d 149 (4th Cir. 1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1038, 140 L.Ed.2d 104 (1998), the Fourth Circuit concluded that *Bailey*'s guidance is "imperfect" when applied to the inchoate crime of conspiracy:

> *Bailey* deals with the application of § 924(c)(1) when the predicate offense is a substantive crime. Conspiracy, however, is an inchoate crime. As stated by the Supreme Court, our legal system "identifies the agreement to engage in a criminal venture as an event of sufficient threat to social order to permit the imposition of criminal sanctions for the agreement alone, plus an overt act in pursuit of it, regardless of whether the crime agreed upon actually is committed." The post*Bailey* [sic] application of § 924(c)(1) in cases where conspiracy to commit a violent crime is the predicate offense, and the underlying crime has been committed, is straightforward.... *When the agreed-upon crime is never committed, however, Bailey can only be applied in a more general sense.*

*Id.* at 153 (emphasis added) (footnote and citation omitted).

The *Phan* court then came to the conclusion, under facts very similar to those before us, that the defendant could properly be said to have "used" the firearm at issue: "In the context of the inchoate crime of conspiracy to commit robbery, we find that the giving of firearms to a fellow conspirator constitutes active employment." *Id.*

We must first note a measure of disagreement with the *Phan* court insofar as it opined that applying section 924(c)'s prohibitions to the inchoate crime of conspiracy is unusually difficult. It is not at all unusual for the government to bring a 924(c) charge when the predicate crime is a *drug-trafficking* conspiracy, *see, e.g., Anderson,* 89 F.3d at 1308, and for us to consider the scope of 924(c) when no drug transaction was ever successfully completed. But we take the *Phan* court's point insofar as it means that in its case, as here, the conspiracy was halted long before the conspirators came close to committing the burglary. And here, as Taylor points out, his only connection to the firearm in question—its transfer to his coconspirator—came long before the burglary itself was even contemplated.

Considering these circumstances, we find ourselves constrained to disagree with the ultimate conclusion of the Fourth Circuit. Taylor's transfer of a firearm to Piper days in advance of the time when the object of the conspiracy was to occur falls short of the "active employment" that the *Bailey* Court mandated be shown. We find Taylor's actions to be analogous to the type of activity we have often rejected as insufficient in our post-*Bailey* decisions in the drug-trafficking context. We therefore reverse Taylor's conviction.

### D.

■ Finally, Taylor argues that his Hobbs Act conviction must be reversed in light of the Supreme Court's decision in *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). In particular, he contends, the Hobbs Act is unconstitutional insofar as it is applied to the robbery of a private citizen, or burglary of a private residence. Taylor does *not* argue that the government produced insufficient evidence that his crime had an effect on interstate commerce; he raises only a legal challenge to the scope of the Hobbs Act, as applied.

In *Lopez,* the Supreme Court struck down the Gun–Free School Zones Act of 1990, 18 U.S.C. § 922(q), as violative of the Commerce Clause, because Congress had placed no interstate commerce element in the statute. Unlike the statute in *Lopez,* however, the Hobbs Act involves activity which courts have repeatedly found has a substantial effect on interstate commerce. *See, e.g., United States v. Stillo,* 57 F.3d 553, 558 (7th Cir.1995). Also, the Hobbs Act contains a specific jurisdictional requirement; it applies to "[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce." 18 U.S.C. § 1951(a). Further, the Supreme Court has, on more than one occasion, upheld the constitutionality of the Hobbs Act. *See Stirone v. United States,* 361 U.S. 212, 215, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960); *United States v. Green,* 350 U.S. 415, 420, 76 S.Ct. 522, 100 L.Ed. 494 (1956). And, not insignificantly, this court has already affirmed the constitutional validity of the Hobbs Act in the face of a *Lopez* challenge. *See United States v. Valenzeno,* 123 F.3d 365, 367 (6th Cir.1997).

Taylor's argument that *Lopez* should be applied to invalidate his prosecution under the Hobbs Act must be rejected.

### III.

Taylor's judgment of conviction under 18 U.S.C. § 924(c) is **REVERSED**, and the matter is **REMANDED** for proceedings consistent with this opinion. We otherwise reject his arguments on appeal.

DAVID A. NELSON, Circuit Judge, concurring in part and dissenting in part.

I concur in all but Part II C of the court's opinion. With regard to the issues

discussed in that part, I agree that a conspiracy to commit a robbery that would violate the Hobbs Act is itself a "crime of violence" within the meaning of 18 U.S.C. § 924(c). See *United States v. Phan,* 121 F.3d 149, 152–53 (4th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1038, 140 L.Ed.2d 104 (1998) ("A Hobbs Act conspiracy to commit robbery ... is a separate crime of violence providing its own predicate for § 924(c)(1) liability"). I disagree, however, with the conclusion that under *Bailey v. United States,* 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), no rational juror could find that defendant Taylor "used" a firearm during and in relation to the Hobbs Act conspiracy when he placed a firearm in the hands of the man who was expected to commit the robbery that was the object of the conspiracy.

The majority's conclusion on this issue is contrary to the conclusion reached by the Fourth Circuit, under comparable circumstances, in *Phan.* I am not persuaded that *Phan* is inconsistent with *Bailey,* and I would affirm defendant Taylor's § 924(c) conviction as well as affirming his conviction for conspiracy.

### I

The § 924(c) conviction must be affirmed, under *Bailey,* if the record contains "evidence sufficient to show an *active employment* of the firearm by the defendant, a use that makes the firearm an operative factor in relation to the predicate offense." *Bailey,* 516 U.S. at 143. "Active employment," the Supreme Court has made clear, is not limited to the defendant's brandishing the weapon or firing or attempting to fire it during and in relation to the predicate offense. See *Smith v. United States,* 508 U.S. 223, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993), where the predicate offense was a drug trafficking crime; there the court held that the defendant had "use[d]" the weapon during and in relation to the predicate offense when he bartered a gun for drugs.

*Smith* is not inconsistent with *Bailey,* as the latter decision explains. Notwithstanding that *Smith* "declined to limit 'use' to the meaning of 'use as a weapon,'" *Smith*'s interpretation of § 924(c) "nonetheless adhered to an active meaning of the term." *Bailey,* 516 U.S. at 148. It is thus no accident that *Bailey*'s illustrative list of uses that may constitute "active employment," *id.,* includes "bartering." ("The active-employment understanding of 'use' *certainly* includes brandishing, displaying, *bartering,* striking with, and most obviously, firing or attempting to fire a firearm.") (Emphasis supplied.)

The weapon in the case before us was not bartered, of course—but suppose, for purposes of analysis, that it had been. Suppose, in other words, that defendant Taylor had delivered the firearm to the prospective robber not for use in the robbery, but as a down-payment for the robber's services. *Bailey* teaches that delivery of the firearm under these circumstances would "certainly" have been an "active employment" of the weapon during and in relation to the Hobbs Act robbery conspiracy. This being so, I am at a loss to understand why the delivery of the weapon to the prospective robber for use in the robbery itself would not likewise be an active employment of the weapon during and in relation to the conspiracy.

Delivery for the purpose of payment is no more "active" than delivery for the purpose of enhancing the robber's firepower. It seems to me that each type of delivery—a delivery in payment for the prospective robber's services and a delivery to promote the successful accomplishment of the robbery that is the object of the conspiracy—would qualify as "an *active employment* of the firearm by the defendant, a use that makes the firearm an operative factor in relation to the predicate [conspiracy] offense." See *Bailey,* 516 U.S. at 143.

## II

There are two appellate court decisions—one from this circuit—that strengthen me in this conclusion. The first is *United States v. Anderson*, 89 F.3d 1306 (6th Cir.1996), *cert. denied*, 519 U.S. 1100, 117 S.Ct. 786, 136 L.Ed.2d 728 (1997), where a panel of this court addressed the question whether a jury could find that a gun had been "used" in relation to a drug offense when there was evidence that the defendant was reaching for the weapon when law enforcement agents entered his apartment to search for drugs. Although the defendant's conviction was set aside for instructional error, the panel expressly held that, under *Bailey*, "a defendant who reaches for a gun, whether the gun is visible or hidden, uses that gun for purposes of 18 U.S.C. § 924(c)." *Id.* at 1315.

The *Anderson* panel understood the lesson of *Bailey* to be that a gun could not be found to have been used in violation of § 924(c) absent "reliable objective manifestations of the defendant's intent to use the gun in connection with the underlying offense." *Id.* at 1314. Such an "objective manifestation" was found to be present in *Anderson:* "an act of reaching for the gun provides a generally reliable manifestation of defendant's intent to use the gun in much the same way that 'brandishing, displaying, bartering, striking with, and most obviously, firing or attempting to fire' a gun provides such a similarly accurate manifestation of intent to use." *Id.* at 1315.

In the case at bar, similarly, I should have thought that defendant Taylor's delivery of the gun to the prospective robber "provide[d] a generally reliable manifestation" of the defendant's intent to use the gun in connection with the Hobbs Act conspiracy that constituted the underlying offense. If so, under *Anderson*'s interpretation of *Bailey*, the defendant violated § 924(c).

The second decision, of course, is that of the Fourth Circuit in *Phan*—a case that involved a defendant's delivery of two handguns to a prospective robber for use in the robbery. This act of delivery, the Fourth Circuit pointed out, "was in itself an overt act in furtherance of the conspiracy." *Phan*, 121 F.3d at 153.

In *Phan*, as here, the robbery never actually took place—but "[t]he relevant question," as the court noted, "is whether [the defendant] actively employed the handguns during and in relation to the *conspiracy*, not whether the handguns were actively employed during and in relation to the *robbery*." *Id.* (emphasis supplied). The Fourth Circuit did not read *Bailey* as foreclosing an affirmative answer to the question whether the handguns had been actively employed in relation to the conspiracy.

"[T]he nexus between the handguns and the conspiracy to commit robbery could not be closer," the Fourth Circuit observed, the handguns having been transferred "in preparation for their eventual use during the robbery." *Id.* The use made of the handguns in *Phan* would obviously have passed *Anderson*'s "objective manifestation" test, and it seems to me that the Fourth Circuit was correct in concluding that there was evidence of an active employment of the firearms, within the meaning of *Bailey*, during and in relation to the predicate conspiracy offense. Because I would reach the same conclusion here, I respectfully dissent from the reversal of Mr. Taylor's § 924(c) conviction.