*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0264P (6th Cir.)
File Name: 00a0264p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
　　　　　*Plaintiff-Appellee,*

　　　*v.*　　　　　　　　　　　No. 98-6490

MIN NAN WANG,
　　　　　*Defendant-Appellant.*

Appeal from the United States District Court
for the Middle District of Tennessee at Cookeville.
No. 96-00008—Thomas A. Wiseman, Jr., District Judge.

Argued: September 17, 1999

Decided and Filed: August 3, 2000

Before: BATCHELDER and GILMAN, Circuit Judges;
HOOD, District Judge.[*]

———————————

**COUNSEL**

**ARGUED:** Henry A. Martin, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellant. Harold B. McDonough, Jr., ASSISTANT UNITED STATES

———————————————

[*] The Honorable Denise Page Hood, United States District Judge for the Eastern District of Michigan, sitting by designation.

ATTORNEY, Nashville, Tennessee, for Appellee.
**ON BRIEF:**   Henry A. Martin, FEDERAL PUBLIC
DEFENDER'S OFFICE, Nashville, Tennessee, for Appellant.
Harold B. McDonough, Jr., ASSISTANT UNITED STATES
ATTORNEY, Nashville, Tennessee, for Appellee.

BATCHELDER, J., delivered the opinion of the court, in
which GILMAN, J., joined.  HOOD, D. J. (pp. 12-23),
delivered a separate concurring opinion.

―――――――――――

**OPINION**

―――――――――――

ALICE M. BATCHELDER, Circuit Judge.  Min Nan Wang
appeals his convictions of robbery affecting interstate
commerce in violation of 18 U.S.C. § 1951 and of using and
carrying a firearm in relation to a crime of violence (robbery)
in violation of 18 U.S.C. § 924(c)(1).  For the reasons that
follow, we reverse these convictions.

**I**

Paul and Patricia Tsai are the owners of the China Star
Restaurant in Cookeville, Tennessee.   The China Star
purchases meat and seafood from out-of-state suppliers
approximately twice per month.  On September 11, 1995,
Mrs. Tsai closed the restaurant at approximately 9:00 p.m.
and drove to her home in Algood, Tennessee, followed by Mr.
Tsai in a separate car.  She took with her $1200 from the cash
register, $900 of which she intended to deposit in the
restaurant's bank account the next morning. Mrs. Tsai drove
into the garage of her home and then entered the house,
placing the money from the restaurant on the dining room
floor.  She then went to her bedroom, where, unbeknownst to
her, Wang, who had broken into the house sometime earlier,
was lurking.  Wang grabbed Mrs. Tsai from behind and told
her in Chinese to be quiet.  When Mrs. Tsai resisted, Wang
hit her on the head with a hard object, handcuffed her and put
something over her face, telling her to shut up or he would

the underlying crime of robbery under the Hobbs Act, there is
insufficient evidence to convict Wang under § 924(c).
Wang's conviction under Count II must also be reversed.

*Id.* at 100 (footnotes, citations and internal quotations omitted).

Applying the *Collins* factors to the facts in this case, there is insufficient evidence to find a violation of the Hobbs Act. The evidence shows that the Tsais were robbed in their home of $1,200.00 in cash from the restaurant receipts for the day and $3,000.00 in cash from the Tsais' personal account. The evidence is insufficient to show that the total amount taken significantly depleted the Tsais' personal account, business account or restaurant assets or that they were likely to be depleted. The district court found that the restaurant was not closed as a result of the robbery, nor were the Tsais prevented from ordering any goods from out-of state. The evidence does not show that the number of individuals victimized or the sum taken was so large that there was any cumulative effect on interstate commerce. Based on the evidence presented at trial, there was insufficient evidence to support a finding that the robbery of the Tsais at their home had even a *de minimis* affect on interstate commerce. Wang's conviction on Count I is therefore reversed.

## C.   Firearms Charge (Count II)

Section 924(c) makes it unlawful for "any person who, during and in relation to any crime of violence . . . for which the person *may be prosecuted* in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm."  18 U.S.C. § 924(c)(1)(A) (emphasis added).  Section 924(c)(1) is a distinct offense rather than merely being a sentencing enhancement provision. *United States v. Nelson*, 27 F.3d 199, 200 (6th Cir. 1994); *United States v. Ospina*, 18 F.3d 1332, 1335-36 (6th Cir. 1994).  A defendant need not be convicted or even charged with the underlying crime to be convicted under § 924(c). *Nelson*, 27 F.3d at 200.  However, it is necessary that the government prove beyond a reasonable doubt all of the elements of § 924(c), one of which is that the defendant committed the underlying crime.  *Id.* at 200-201.  Because there is insufficient evidence to show that Wang committed

kill her.  He then pulled her into the bathroom, deposited her in the bathtub, and secured her to a railing on the wall next to the bathtub.  Mrs. Tsai recognized Wang's voice because he had once worked as a cook in her restaurant.

As Mr. Tsai parked his car in the garage he heard his wife screaming.  When he entered the house, Wang's accomplice attacked him from the side, hitting him in the head with a hard object.  The accomplice took him to the bedroom closet, handcuffed him to the clothes rail and threatened to kill him unless Tsai told him where the money in the house was.  The assailant showed him a gun, loaded it in front of him, and pointed it at his head.

By this time, Wang had placed tape on Mrs. Tsai's mouth. He told her repeatedly, "Your money or your life."  Wang and his accomplice left their victims on several occasions to confer in a dialect that neither of the Tsais could understand. Each time Wang returned from meeting with his accomplice, he would demand money from Mrs. Tsai.  Mrs. Tsai eventually told Wang about $3000 she had earlier withdrawn from her personal account and left in an envelope on her dining room table.  Before the pair left the house, Wang's accomplice moved Mr. Tsai from the bedroom closet to the utility room.  The robbers drove away in the Tsais' Toyota Corolla automobile.

Wang was later arrested in Chamblee, Georgia, pursuant to a Putnam County, Tennessee, warrant for especially aggravated robbery, especially aggravated kidnapping, and especially aggravated burglary.  On August 21, 1996, a federal grand jury returned a four-count indictment charging Wang with robbery affecting interstate commerce in violation of 18 U.S.C. § 1951 (Count I); using and carrying a firearm in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1) (Count II); carjacking in violation of 18 U.S.C. § 2119 (Count III); and transporting a stolen motor vehicle in interstate commerce, in violation of 18 U.S.C. § 2312 (Count IV).  Wang was also charged with aiding and abetting under 18 U.S.C. § 2 as to all four counts.

The case was tried without a jury. The district court granted Wang's motion for judgment of acquittal on Count III of the indictment and found Wang guilty of the remaining counts. The court sentenced Wang to twenty-four months on Counts I and IV, the robbery and the interstate transportation of stolen motor vehicle counts, followed by five years on Count II for the violation of 18 U.S.C. § 924(c). In handing down this sentence, the district court departed downward ten levels from a total offense level of 26, finding that Wang had been subjected to abuse and threats by individuals who had smuggled him into the United States, that he had been shabbily treated by the United States criminal justice system, and that his offense conduct was aberrational.

Wang timely appealed. He challenges only his convictions with respect to Counts I and II.

## II

Wang first assails his conviction for robbery affecting interstate commerce in violation of 18 U.S.C. § 1951. That statute, the Hobbs Act, provides in relevant part:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a). Wang maintains that, in light of *United States v. Lopez*, 514 U.S. 549 (1995), insufficient evidence existed to support a finding that his robbery affected interstate commerce. The district court expressed a certain level of discomfort with its conclusions in this regard, noting:

> This Court finds that there is no effect on interstate commerce beyond an absolute de minimis effect of $1,200. There is no proof that Dr. and Mrs. Tsai closed

cellular telephone to make business calls. *Id.* at 99. The Fifth Circuit held that the robbery in *Collins* did not violate the Hobbs Act, stating that "if the robbery of an individual were found to affect interstate commerce merely because of the real or perceived disruption of the individual's business by interfering with his work, the reach of section 1951(a) would be ubiquitous, and any robbery, in our closely-interwoven economy, arguably would affect interstate commerce." *Id.* at 100. The Fifth Circuit went on to state, "[h]owever, as broadly as the extension of the interstate commerce requirement has spread, we are still a federal, not a unitary government and, neither the constitutional limits on the power of the national government, nor the jurisdictional requirement of some connection with interstate commerce may be ignored." *Id.* (internal citations omitted) The Fifth Circuit observed that "the Hobbs Act was intended to reach only certain activities that hamper interstate business, reflecting the long-recognized principle that the states are best positioned and equipped to enforce the general criminal laws." *Id.*

The Fifth Circuit also noted that the "depletion-of-assets" theory falls in an indirect effect category on interstate commerce, as opposed to a direct effect on interstate commerce. *Id.* at 99. This "depletion-of-assets" theory is usually applied to businesses engaged in interstate commerce because criminal acts against businesses would have a greater effect on interstate commerce than criminal acts against individuals. *Id.* at 99-100. The Fifth Circuit noted certain circumstances where criminal acts may violate section 1951(a). The following factors were considered by the Fifth Circuit to determine whether the criminal acts directed toward an individual violate section 1951(a):

> (1) the acts deplete the assets of an individual who is directly and customarily engaged in interstate commerce; (2) if the acts cause or create the likelihood that the individual will deplete the assets of an entity engaged in interstate commerce; or (3) if the number of individuals victimized or the sum at stake is so large that there will be some cumulative effect on interstate commere.

There is no proof that Dr. and Mrs. Tsai closed the restaurant, that they were unable to order any further goods from out of state. *There is no evidence of an affect [sic] upon interstate commerce.*

However, this Court is, as I say, bound by precedent, even though I disagree strongly with that precedent and I urge the higher courts to change that precedent as they have begun apparently to do in the *Lopez* case and in others.

Nevertheless, the Court finds that the elements of Count One have been proven, and the Court finds you guilty, Mr. Wang Min Nan, of a violation of Hobbs Act as charged in Count One of the indictment.

(J. A. at 151-52 (emphasis added).)

The district court's finding focused on Wang's activity and found that the money taken from the Tsais in the amount of $1,200.00 had a *de minimis* effect on interstate commerce. The district court did not focus on the victims' activity at the time of the robbery and did not differentiate between a robbery of an individual and a robbery of a business. In *Smith*, the robbery involved a place of business. The Tsais were not at their place of business when they were robbed. The robbery took place at the victims' private home. The evidence shows in this case that the Tsais were involved in the restaurant business and that some of the goods for the business were purchased outside the state of Tennessee. Stolen from the Tsais' home was money brought home from the business, money from their personal account, which was on the dining room table, and a vehicle.

In *United States v. Collins,* 40 F.3d 95 (5th Cir. 1994), the Fifth Circuit delineated the difference between a robbery of a business and of an individual. The government's theory in *Collins* was that the robbery of the victim in his personally-owned vehicle affected interstate commerce because as a consequence of the robbery, the victim was prevented from attending a business meeting and prevented from using his

the restaurant, that they were unable to order any further goods from out of state. There is no evidence of an [e]ffect upon interstate commerce.

Nevertheless, the court decided that precedent from this circuit compelled a finding of guilt with respect to Count I. We review the sufficiency of the evidence supporting Wang's conviction by determining "whether after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Brown*, 959 F.2d 63, 67 (6th Cir. 1992) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

Historically, we have erected a rather low threshold for determining whether robbery directed at a business establishment will give rise to federal criminal jurisdiction under § 1951. To support a conviction under the Hobbs Act, we have required the government to demonstrate nothing more than a de minimis effect on interstate commerce. *See United States v. Harding*, 563 F.2d 299, 302 (6th Cir. 1977). "There is no requirement that there be an actual effect on interstate commerce—only a realistic probability that [an offense] will have an effect on interstate commerce." *United States v. Peete,* 919 F.2d 1168, 1174 (6th Cir. 1990) (emphasis omitted). Thus, for example, we have upheld a Hobbs Act conviction where the defendant attempted to steal between $7,000 and $8,000 from a tavern that purchased goods from local distributors who in turn purchased goods from outside the state. *See Brown*, 959 F.2d at 65. Had the heist been successful, we noted, there was a "realistic probability that the depletion of the bar's assets would have affected the amount of its purchases of beer having moved through interstate commerce." *Id.* at 68.

The jurisprudential landscape has not much changed in the wake of *Lopez*, the landmark case that struck down the Gun-Free School Zones Act of 1990, 18 U.S.C. § 922(q), as an invalid exercise of Congress's power under the Commerce Clause. *See Lopez*, 514 U.S. at 551. Facial constitutional

challenges to the Hobbs Act followed close on the heels of *Lopez*. In turning away the first of these in *United States v. Valenzeno*, we remarked in dicta that "[i]f *Lopez* indicates that the Commerce Clause gives Congress less power than was previously thought to be the case, the proper remedy would be to give the statute a narrower interpretation, or to require a more substantial jurisdictional nexus, not to hold facially invalid an Act of Congress." *Valenzeno*, 123 F.3d 365, 368 (6th Cir. 1997). Ultimately, however, "[w]e join[ed] our sister circuits and [held] that the *de minimis* standard for the interstate commerce effects of individual Hobbs Act violations survived *Lopez*." *United States v. Smith*, 182 F.3d 452, 456 (6th Cir. 1999).

The *Lopez* Court had recognized that the commerce power includes regulation of activities that are connected with a commercial transaction which, viewed in the aggregate, substantially affects interstate commerce. *Lopez*, 514 U.S. at 561. On this basis, we decided that *Lopez* did not require realignment of the Hobbs Act's jurisdictional nexus because individual instances arising under the statute could, through repetition, have a substantial effect on interstate commerce. *See Smith*, 182 F.3d at 456. So in *United States v. Smith*, we upheld the Hobbs Act conviction of a defendant who robbed various Michigan "party stores" of sums in the low four figures, saying, "By proving that the stores Smith robbed did substantial business in beer, wine, and tobacco products, and that virtually none of such products originate in Michigan, the government met its burden." *Id.*

Even as broadly phrased as our precedents are, however, they do not compel the result that the district court reluctantly reached in this case. As with "the overwhelming majority of cases involving the statute," *United States v. Quigley*, 53 F.3d 909, 910 (8th Cir. 1995), our precedents have involved robberies in which the victims were businesses engaged in interstate commerce. But where, as here, the criminal act is directed at a private citizen, the connection to interstate commerce is much more attenuated. *See id.* ("Actions normally have a lesser effect on interstate commerce when

*Bolton*, 68 F.3d 396, 399 (10th Cir. 1995) (internal quotations omitted)).

In *Smith,* the defendant and others robbed party stores. The defendant argued on appeal that the test under the Hobbs Act was whether the robberies had a "substantial effect" on interstate commerce, instead of the "de minimis" effect previously required in this Circuit. *Id.* at 456. Applying the Tenth Circuit's reasoning that the single activity of the perpetrator is not the test but, in the aggregate, whether the activities substantially affect interstate commerce, this Circuit found that the government had met its burden by proving that the robbed stores conducted "substantial" business in beer, wine, and tobacco products, and that most of the products did not originate in Michigan. *Id.* The single "activity" of the perpetrator and "the *de minimis* character of individual instances arising under the statute is of no consequence." *Bolton*, 68 F.3d at 399.

In its ruling, the district court in this case believed that it was bound by this Circuit's cases regarding the *de minimis* test of how to determine the effects of the activity on interstate commerce under the Hobbs Act. Based on *Smith*, the district court was correct in its conclusion that the *de minimis* standard is still applicable under the Hobbs Act in this Circuit. However, the facts in this case are distinguishable from the *Smith* case.

The district court in its finding stated:

Now then, on the question of Count One of the indictment. This Court has previously expressed its legal reservations, its philosophical reservations about the Hobbs Act and its unreasonable stretching of the commerce clause beyond all recognition.

However, this Court is bound by precedents from the United States Supreme Court, as well as the Sixth Circuit. *This Court finds that there is no effect on interstate commerce beyond an absolute de minimis effect of $1,200.*

In the *Valenzeno* case, this Circuit had the opportunity to address the Hobbs Act post-*Lopez*. The sufficiency of the effect on interstate commerce was not addressed, however, because the defendant did not raise that issue on appeal. *Valenzeno* only addressed the constitutionality of the Hobbs Act in light of *Lopez*. This Circuit noted in *Valenzeno* that "[i]f *Lopez* indicates that the Commerce Clause gives Congress less power than was previously thought to be the case, the proper remedy would be to give the statute a narrower interpretation, or to require a more substantial jurisdictional nexus, not to hold facially invalid an Act of Congress." *Valenzeno*, 123 F.3d at 368.

Consistent with the *Lopez* case, the jurisdictional test of a federal statute such as the Hobbs Act is whether the regulated activity "substantially affects" interstate commerce. The Supreme Court in *Lopez* acknowledged that, prior to *Lopez*, case law did not clearly indicate whether an activity must "affect" or "substantially affect" interstate commerce in order for Congress to exercise its power under the Commerce Clause. *Lopez*, 514 U.S. at 559. The Supreme Court then announced that the test should be the "substantially affects" test. *Id.* The Supreme Court also noted that the jurisdictional element should be determined on a "case-by-case inquiry." *Id.* at 561.

Under the Hobbs Act, the "substantially affects" test focuses on the "activity" of the victim involved, rather than the single criminal act performed by the defendant, and how that activity affects interstate commerce. *See United States v. Smith*, 182 F.3d 452, 456 (6th Cir. 1999). In *Smith*, this Circuit held that "the *de minimis* standard for the interstate commerce effects of individual Hobbs Act violations survived *Lopez*." *Id.* at 456. The Court adopted the Tenth Circuit's reasoning regarding the *Lopez* decision that, "if a statute regulates an activity which, through repetition, in aggregate has a substantial effect on interstate commerce, the *de minimis* character of individual instances arising under the statute is of no consequence." *Id.* (citing *United States v.*

directed at individuals rather than businesses."). This case presents our first opportunity to address the showing that the government must make to demonstrate that the robbery of an individual had a "realistic probability" of affecting interstate commerce. *Cf. United States v. Taylor*, 176 F.3d 331, 339 (6th Cir. 1999) (rejecting a blanket constitutional challenge to the Hobbs Act as applied to robberies of private citizens, or burglaries of a private residences). We hold that the required showing is of a different order than in cases in which the victim is a business entity.

Those Courts of Appeals that have considered this question—even in the pre-*Lopez* era—have recognized that a robbery of a private citizen that causes only a speculative indirect effect on a business engaged in interstate commerce will not satisfy the jurisdictional requirement of the Hobbs Act. The Fifth Circuit, for example, refused to apply the Act to the robbery of an automobile and a cellular telephone from a computer company executive, even though the crime might have prevented the victim from attending business meetings or making business calls. *United States v. Collins*, 40 F.3d 95, 100 (5th Cir. 1994) (holding that "[c]riminal acts directed toward individuals may violate section 1951(a) only if: (1) the acts deplete the assets of an individual who is directly and customarily engaged in interstate commerce; (2) if the acts cause or create the likelihood that the individual will deplete the assets of an entity engaged in interstate commerce; or (3) if the number of individuals victimized or the sum at stake is so large that there will be some 'cumulative effect on interstate commerce' " (footnotes omitted)). Another court held that a robbery of two individuals who were en route to a liquor store to make a purchase had no effect or realistic potential effect on interstate commerce. *Quigley*, 53 F.3d at 910-11 (following *Collins*). Similar concerns were voiced in cases involving extortion directed at private citizens. *See, e.g., United States v. Mattson*, 671 F.2d 1020, 1024-25 (7th Cir. 1982) (holding that extortion directed against an individual does not affect interstate commerce where the payoff does not deplete the assets of an entity engaged in interstate commerce and no other connection with interstate

commerce exists); *see also United States v. DeParias*, 805 F.2d 1447, 1451 (11th Cir. 1986) (citing *Mattson* for this proposition), *overruled on other grounds by United States v. Kaplan*, 171 F.3d 1351, 1357 (11th Cir. 1999).

The conclusions of our sister circuits are bolstered by *Lopez.* The Hobbs Act's de minimis standard survives *Lopez* by virtue of the aggregation principle. But the *Lopez* Court declined to apply the aggregation principle in conjunction with long chains of causal inference that would have been necessary to arrive at a substantial effect on interstate commerce. Thus, when the United States argued that gun possession in school zones would , in the aggregate, result in violent crime which would result in costs which would affect the national economy through the mechanism of insurance, the Court responded: "To uphold the Government's contentions here, we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Lopez*, 514 U.S. at 567; *see also A.L.A. Schecter Poultry Corp. v. United States*, 295 U.S. 495, 554 (1935) (Cardozo, J., concurring) ("There is a view of causation that would obliterate the distinction between what is national and what is local in the activities of commerce. . . . Activities local in their immediacy do not become interstate and national because of distant repercussions."). Just this sort of "butterfly effect" theory of causation would be required to find liability in the great majority of Hobbs Act cases in which the victim is a private citizen.[1]  *See* James Gleick, Chaos: Making a

---

[1] This might also be viewed as the "dog, dog bite pig" theory of causation. *See The Little Old Woman and Her Pig*, *in* The Tall Book of Nursery Tales 92 (1972). The little old woman had been stymied in her attempt to get home because her recalcitrant pig refused to cross a stile. So the old woman gave water to a haymaker for a wisp of hay to give to a cow for some milk to induce a cat to begin to kill a rat that began to gnaw a rope that began to hang a butcher who began to kill an ox who began to drink some water that began to quench a fire that began to burn a stick that began to beat the dog who began to bite the pig who jumped over the stile in a fright. *Id.* at 97. While this sequence of events got the

18 U.S.C. § 1951 states in pertinent part:

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery . . . or attempts or conspires to do so, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a). In order to prevail under a Hobbs Act violation, the Government must prove two elements: 1) interference with interstate commerce, which is a jurisdictional issue; and, 2) the substantive criminal act, which in the instant case is robbery. *Stirone v. United States*, 361 U.S. 212, 218 (1960).

Wang does not argue that the Hobbs Act is unconstitutional. The Hobbs Act's constitutionality has been repeatedly upheld. *United States v. Valenzeno*, 123 F.3d 365, 368 (6th Cir. 1997). Wang also does not challenge the robbery element of his conviction under the Hobbs Act. Wang claims that since the Supreme Court's decision in *United States v. Lopez*, 514 U.S. 549 (1995), the proper test for the jurisdictional element in a federal statute is whether the activity "substantially affects" interstate commerce. *Id.* at 559. Under this standard, Wang claims that there is insufficient evidence to support his conviction. *Id.*

The Government cites pre-*Lopez* cases to support its argument that, in this Circuit, only a *de minimis* effect on interstate commerce is required to support a conviction under the Hobbs Act. *See, e.g., United States v. Harding*, 563 F.2d 299, 303 (6th Cir. 1977). Prior to *Lopez*, this Circuit held that there is no requirement that there be an actual effect on interstate commerce, but only a showing that there be a realistic probability that the activity would have affected interstate commerce. *United States v. Brown*, 959 F.2d 63, 67, 75 (6th Cir. 1992).

and his family had been subjected to violence and threats, that Wang had been treated badly by the criminal justice system in this country, and that Wang had a previously clean record and the act appeared aberrational. Wang was sentenced to 24 months on Counts I and IV, followed by a mandatory 60-month sentence on Count II, to be served consecutively, for a total term of 84 months.

## II. ANALYSIS

### A. Standard of Review

Wang claims there was insufficient evidence to convict him under the Hobbs Act, 18 U.S.C. § 1951, in Count I and as an aider and abettor on the firearm charge in Count II. Insufficiency of evidence claims are determined by considering "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Brown*, 959 F.2d 63, 67 (6th Cir. 1992) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

Wang also claims that the district court incorrectly applied the conspiracy theory set forth in *Pinkerton v. United States*, 328 U.S. 640, 645-648 (1946), by weighing the evidence for conviction under 18 U.S.C. § 924(c)(1) where he was not charged with conspiracy. This issue is a question of law, reviewable under a *de novo* standard. *United States v. Graves*, 60 F.3d 1183, 1185 (6th Cir. 1995).

### B. The Hobbs Act (Count I)

Wang claims that there is insufficient proof on the record to support a finding of guilt under 18 U.S.C. § 1951 (the "Hobbs Act") because the Government failed to show that the robbery of the victims in this case had an effect on interstate commerce sufficient to meet the jurisdictional nexus required under section 1951.

New Science 8 (1987) (discussing the parable of the flapping of a butterfly's wings that creates a minor air current in China, that adds to the accumulative effect in global wind systems, that ends with a hurricane in the Caribbean). Per *Lopez*, a small sum stolen from a private individual does not, through aggregation, affect interstate commerce merely because the individual happens to be an employee of a national company, or happens to be on his way to a store, or happens to be carrying proceeds from a restaurant.

This is not to say that criminal acts directed at private citizens will never create jurisdiction under the Hobbs Act. The federal courts have acknowledged, for example, that victimization of a large number of individuals, or victimization of a single individual for a very large sum, can have the potential directly to affect interstate commerce. *See, e.g.*, *United States v. Farrell*, 877 F.2d 870, 875-76 (11th Cir. 1989) (holding that extortion demand of $1,540,000 "would have affected interstate commerce to a legally cognizable degree"). But when the Government seeks to satisfy the Act's jurisdictional nexus by showing a connection between an individual victim and a business engaged in interstate commerce, that connection must be a substantial one—not one that is fortuitous or speculative. We have suggested that the Government might make such a showing by demonstrating that the defendant knew of or was motivated by the individual victim's connection to interstate commerce. *See United States v. Mills*, 204 F.3d 669, 670 (6th Cir. 2000) (holding that solicitation of bribes from individuals gave rise to federal jurisdiction under the Hobbs Act because the defendants "had actual knowledge that the bribe money would be obtained through loans made in interstate commerce"). Other avenues of proof will no doubt present themselves. We would anticipate, however, that the "overwhelming majority" of Hobbs Act cases brought before the federal courts will

---

little old woman home that night, such a causal chain will not suffice to put Mr. Wang in federal court.

continue to be ones in which the victims are businesses directly engaged in interstate commerce.

In the present case, application of these principles dictates reversal of Wang's conviction with respect to Count I. Wang robbed private citizens in a private residence of approximately $4,200, a mere $1,200 of which belonged to a restaurant doing business in interstate commerce. The Government made no showing of a substantial connection between the robbery and the restaurant's business, and the district court held that "[t]here is no evidence of an [e]ffect on interstate commerce."[2]  In the absence of such a showing, there is no realistic probability that the aggregate of such crimes would substantially affect interstate commerce. Indeed, upholding federal jurisdiction over Wang's offense would, in essence, acknowledge a general federal police power with respect to the crimes of robbery and extortion. The Supreme Court, however, has this Term reminded us that:

> The Constitution requires a distinction between what is truly national and what is truly local. In recognizing this fact we preserve one of the few principles that has been consistent since the Clause was adopted. The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States. Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims.

*United States v. Morrison*, 120 S. Ct. 1740, 1754 (2000) (citations omitted). Due regard for this admonition requires

---

[2] This finding was preceded by the statement that "there is no effect on interstate commerce beyond an absolute de minimis effect of $1200." It is clear, however, that the district court believed—correctly—that the effect here did not rise even to the level of de minimis.

room a few times to confer with someone else in a Chinese dialect, which he did not understand. He returned to the bedroom to ask Mr. Tsai about the money. Before the men left, Mr. Tsai was taken from the bedroom closet and handcuffed to a pipe in the laundry room. The men were in the house for about twenty to thirty minutes. Mr. Tsai was eventually able to open the garage door and call to a neighbor, who then alerted the police. The Tsais' Toyota Corolla automobile was stolen. It was recovered the following day at the Atlanta airport.

During the Tsais' ordeal, a police officer was conducting an investigation of a green Ford Tempo owned by Agency Rent-A-Car parked about .2 miles from the Tsais' home. This police officer was summoned to the Tsais' home. He later returned to the green Ford Tempo and determined from a rental agreement found in the car that the car had been rented by Wang using a credit card. A pair of handcuffs, bottled water and partially eaten sandwiches were found in the rental car. Wang later reported to the car rental company that the car had been stolen. Wang's credit card records indicate that on the date the Tsais were robbed, his credit card was used to make purchases at a gas station and convenience market located a few miles from the Tsais' home. The surveillance video tape from the gas station and market recorded Wang and another man purchasing sandwiches and bottled water similar to those found in the rental car.

Wang was arrested in Chamblee, Georgia, pursuant to a Putnam County, Tennessee, warrant for especially aggravated robbery, especially aggravated kidnaping, and especially aggravated burglary. The credit card used to rent the green Ford Tempo and to make purchases at the gas station and market near the Tsais' home were found in Wang's wallet.

After Wang waived his right to a trial by jury, a bench trial was held. Wang was found guilty on Counts I, II and IV. The district judge acquitted Wang on Count III, the carjacking count. The district judge departed ten levels downward from the Total Offense Level of 26 to Level 16, stating that Wang

Tsais' employees had recruited Wang in Atlanta to substitute for a worker on leave.

Mrs. Tricia Tsai, who works at the restaurant, testified that her husband, Paul Tsai, came every night to close the restaurant. On September 11, 1995, after the Tsais closed the restaurant, they drove home in separate cars. Mrs. Tsai had $1,200.00 in cash from the day's receipts which she planned to deposit in the bank the next day. The Tsais arrived at home and parked their cars in the garage. Mrs. Tsai testified that she entered the home first, placing the bag with the restaurant receipts on the floor in the dining room. When she entered her bedroom, someone grabbed her from behind. She was told to shut up and was hit on her head with a hard object which she could not identify. Mrs. Tsai was then handcuffed and taken into the bathroom. There, Mrs. Tsai was told to shut up, or she would be killed. Hearing the man speak Chinese, Mrs. Tsai recognized the voice as Wang's, whom she knew as Wang Pong. The man was wearing a mask, and the room was dark. The man asked her about the money. Mrs. Tsai told him the location of the money. In addition to the $1,200.00 in cash from the restaurant, $3,000.00 in cash from the Tsais' personal account was on the dining room table. Mrs. Tsai was then handcuffed to a fixture in the bathroom, and the man left the room. The man returned a few times to the bathroom to ask Mrs. Tsai where the money was located. Mrs. Tsai heard the man confer with another person in a low voice. After Mrs. Tsai told the man where the $3,000.00 was located, the two men left the house.

Mr. Tsai testified that shortly after Mrs. Tsai entered the house, he heard her screaming. He was attacked as soon as he entered the house and then hit with a weapon. The man who attacked him took Mr. Tsai to the bedroom and handcuffed him to a rail.[1] He threatened Mr. Tsai and asked for money. Mr. Tsai saw that this man had a small gun which he used to hit Mr. Tsai. Mr. Tsai testified that his attacker also left the

---

[1]This man was never identified or apprehended.

that Wang's case be heard in state court. We therefore reverse his Hobbs Act conviction.

### III

Wang next challenges his conviction for using a firearm in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1). The district court held Wang liable for his accomplice's possession of a gun during the robbery under the doctrine of *Pinkerton v. United States*, 328 U.S. 640 (1946), and, in the alternative, under an aiding and abetting theory. Wang maintains that a *Pinkerton* theory is inapplicable because he was not charged with conspiracy, and that the government did not prove (as it must on an aiding and abetting theory) that he knew "to a practical certainty" that his accomplice was carrying a gun. *See United States v. Morrow*, 977 F.2d 222, 231 (6th Cir. 1992) (en banc).

We need not resolve these thorny questions. Section 924(c)(1) provides for a term of imprisonment for "any person who, during and in relation to any crime of violence . . . *for which the person may be prosecuted in a court of the United States*, uses or carries a firearm . . . ." (emphasis supplied). This circuit has held that this language requires that "the defendant have committed a violent crime for which he may be prosecuted in federal court." *Smith*, 182 F.3d at 457 (emphasis omitted). And in *Smith*, we cited with approval the holding of the Fifth Circuit in *Collins* that a § 924(c) conviction cannot stand when the trial court had no jurisdiction over the predicate crime. *See Collins*, 40 F.3d at 101 ("Section 924(c)(1) requires that the underlying offense be a federal crime and, as the robbery[] conviction for violation of section 1951(a) is now voided, the conviction for unlawful use of a firearm during that robbery also must be reversed."). Because Wang's robbery did not have even a de minimis effect on interstate commerce, the crime could not properly have been prosecuted in federal court. Accordingly, Wang's § 924(c) conviction must also be reversed.

---

**CONCURRENCE**

---

DENISE PAGE HOOD, District Judge, concurring. For the reasons set forth below, I concur in the judgment that Wang's convictions on Counts I and II must be reversed.

## I. BACKGROUND

On August 21, 1996, a grand jury returned a four-count indictment charging Appellant Min Nan Wang with the following: 1) robbery affecting interstate commerce in violation of 18 U.S.C. § 1951; 2) using and carrying a firearm in relation to a crime of violence (robbery) in violation of 18 U.S.C. § 924(c)(1); 3) carjacking in violation of 18 U.S.C. § 2119; and 4) transporting a stolen motor vehicle in interstate commerce in violation of 18 U.S.C. § 2312. Wang was also charged with aiding and abetting under 18 U.S.C. § 2 as to all four counts.

The case was tried without a jury. The district court granted Wang's motion for judgment of acquittal on Count III (the carjacking count) of the indictment. Wang was found guilty on the remaining three counts. Wang now appeals his conviction on Counts I and II. Wang does not challenge his conviction on Count IV. As to Count I, the robbery charge, Wang claims that the evidence was insufficient to show a connection between the property obtained from the robbery and any activity having an effect on interstate commerce. On Count II, using or carrying a firearm in relation to a crime of violence, Wang claims that he was wrongfully convicted on a theory of liability based on conspiracy, where a conspiracy was not charged in the indictment. Wang further claims that the evidence was insufficient to support his conviction as an aider and abettor on Count II.

Wang is a citizen of the People's Republic of China from the city of Fuzhou, Fujian Province. He illegally entered the United States in 1991. Wang was smuggled into the United States by professional smugglers called "the Snakeheads" for a fee of $30,000.00. Once in America, the money had to be repaid, with interest. The Snakeheads use physical threats and assaults to enforce the collection of such fees, including threats and force against family members remaining in China. The Snakeheads are able to locate these immigrants nearly anywhere in the United States because they usually remain in the Chinese community due to the language barrier and their illegal alien status.

Wang has lived in New York City and Atlanta, working in various restaurants. Ms. Chen Ping, an associate of Wang, testified that there were several incidents involving Wang and the Snakeheads while Wang resided in New York. Ping testified that in 1994 gang members came into a restaurant where she and Wang worked, demanding $2,000.00 from Wang. Gang members also entered the apartment of Ping and Wang and demanded $1,600.00 from Wang and beat him with a cordless telephone when he did not produce the money. After this incident, Wang and Ping went into hiding and fled to Atlanta, but the threats and visits from the Snakeheads continued. Ping stated that gang members came to their apartment in Atlanta, demanding $1,000.00 from Wang. On another occasion, gang members broke down Wang's door, attacked him and demanded $9,000.00. The gang members also made threats that Wang's family in China would be harmed if he did not pay. Ping contacted Wang's sister in China to warn the family of the Snakeheads' threats, but the sister informed Ping that the gang had already "visited" the family in China. Wang had previously borrowed money from friends to pay the Snakeheads. Wang called the police to inform them of the threats he had received. A police officer took a report but did nothing more than advise Wang to relocate.

In June or July of 1995, Wang worked for three weeks at the China Star restaurant in Cookeville, Tennessee. The China Star is owned by a Chinese-American couple, Tricia and Paul Tsai, who reside in Algood, Tennessee. One of the